Okay, the first case is John Harris P.C. v. Gerald Tobin, and both lawyers are on the phone. Counsel for Harris P.C., you're on the phone, Mr. Harris? Yes, good morning, John Harris, and thank you for accommodating my request for a telephone argument. All right, we can hear you fine. And Mr. Goldstein, are you on the phone? Yes, Your Honor, I'm on the phone. All right. So, Mr. Harris, you have ten minutes. You're going to reserve two minutes for rebuttal. You cannot see the clock. The clock will run here in the courtroom. As we approach approximately two minutes left, we'll give you an oral warning. And with that, you may proceed. I appreciate that. I will try to be very brief this morning under the circumstances, and I will rely on my written briefs except for two very specific points, and the first one is that the issue of standing of the defendants to pursue their cross-appeal, the judgment has been paid by the defendants, and my argument is that by paying the judgment without any compulsion, they have waived their right to the cross-appeal. I moved on this issue in this court in, I think, about a year ago. My motion was tied without any elaboration on the decision on the motion. And I... Why should they be punished for paying the judgment, which is why... It's not a question of punishment. It's a question of standing. And the cases I cited, and in fact, even some of the cases that the defendants cited in their opposition brief, state that a defendant... I underline defendant. I emphasize defendant because the rule is different for a plaintiff who has received judgment, a judgment creditor who has received judgment cases, state that a defendant who pays the judgment loses standing to pursue an appeal. It's not a question of punishment. All right. One of... My... And that's essentially my first point. I wish to revisit... I wish the court to revisit that issue because elaboration are all in the motion underlying it. My second point has to do with the calculation by the district court of the rate at which my time was billed and should have been billed. By way of very brief background, the defendants have denied the existence of a retainer agreement. A retainer agreement, draft retainer agreement was sent to them together with the first invoice in the case when I, as a separate entity from F.C. Baker and Green, first billed the defendants. And that written retainer agreement had a rate of $275 an hour. Before that, I was with Epstein, Baker, and Green, and these very same defendants or these very same clients at that point for these very same cases for which I took over after I was no longer with Epstein, Baker, and Green, these very same clients paid at a rate of $450 an hour for my work. My agreement was rejected after I sued these clients. My agreement was rejected. They said that I am limited and the district court agreed that I am limited to quantum merit recovery. You all have agreed that the case law on the issue of the recovery for quantum merit has all factors, a number of factors by which a court can determine the correct amount for a quantum merit recovery. And the district court, however, appears to have recognized all those cases and recognized all those factors, but only based the finding that $275 an hour was the proper amount based only on the fact that invoices were issued by my firm after I had left Epstein, Baker, and Green, invoices were issued pursuant to the written agreement which the defendants eventually never signed, and those invoices reflected $275 as the hourly rate. Right. Those are the invoices you sent, right? The invoices I sent, yes. Right. And so there's ample authority for the proposition that in quantum merit you can't get more than what you billed for. That's the Second Circuit has acknowledged that under New York law. The Second Circuit has acknowledged that in the Marr Oil Company, and that is based on a New York case called Prager v. New Jersey Fidelity, and that case said essentially that the billed amount is great evidence as to what the value of the attorney's services are. However, if you were willing to work for a number of years at $275 an hour, why was it unreasonable for an abuse of discretion for the judge to say that that's a reasonable amount? That's a reasonable amount. First of all, because it was contrary to the law. It was that $275 was clearly permanent pursuant to the agreement, which the defendants later on repudiated. They never repudiated the agreement while the representation was going on. So there were other... I'm sorry. There was also the concern that why what might otherwise have been a breach of contract action was being heard as quantum meruit was because you had not fully performed all of the obligations under that contract, and to award you more than what you billed would be like a windfall to you. Again, on review of whether the district judge abused its discretion, how could we find that all of those factors don't support its decision? Because that is not the reason why the contract was repudiated. The contract was repudiated according to the defendants. I understand that, but the reason quantum meruit had to be the basis for recovery was because you had not fully performed the contract, and so the view was that you shouldn't be getting more by not fully performing the contract than you would have gotten if you had performed the contract and then sued for breach. Mr. Harris, you have about a minute left. I'm sorry. I don't think there is any issue in the case whether or not I had performed the contract. In fact, it's clear from the correspondence that what happened was at the point of dispute between myself and my clients, the client essentially first said, I will relieve you, and then said, I will not relieve you, so I had to move to be relieved from the underlying case. But the point, the crucial point that I want to make here is that there are, unlike Mar-a-Lago, unlike Prager, there are two sets of invoices here. My invoices are 275, which are dependent on the execution of the agreement, and the other set of invoices, which are the invoices that built my time for the same clients, the same cases by Enstein, Becker, and Green, was at 450 per hour. My point being that if we're going to see whether the one set of evidence or the other set of evidence should be more valid, I think more weight has to be given to the estimation of the value of my work by a large firm like Enstein, Becker, and Green, rather than a startup sole practitioner like myself, who is trying to get in clients, and that's why it's discounting the rate, not because my work was, not because this was an estimation of my, or the worth of my work, but because I simply, I was building my case. In fact, these clients, I think, were my first clients when I hung out my shingle. All right. Mr. Harris, Mr. Harris, you can't see it, but your red light has been on for a while. You saved some time for rebuttal. We'll hear from Mr. Goldstein. Thank you, Your Honor. I'll just briefly address the two points that Mr. Harris raised. As far as standing for our cross-appeal, we were under compulsion to pay the judgment because there was a judgment that's still in effect. We believe that it should be reduced to the amount that the appellant had stated in his correspondence to our client. But as it stands right now, there is an existing judgment, and we paid it as required by law. So we don't believe that that constitutes a waiver of the right to cross-appeal. And the second point that Mr. Harris made with regard to the billing rate, you know, Mr. Harris chose the rate of $275, and the fact that it was listed in his unsigned retainer agreement really is irrelevant. What is relevant is the fact that for four years he sent bills knowing that he did not have a signed retainer agreement seeking that exact amount, $275. Epstein-Beckman Green's billing rate is not comparable. Epstein-Beckman Green is a large firm. It provides additional resources to clients. It has overhead. You can't compare the billing rate for a large firm with the billing rate for a solo practitioner. So it's an apples and oranges comparison. And in any event, Mr. Harris conceded that effectively by sending bills for four years at the $275 billing rate. Unless the panel has any questions, which I'm happy to answer, I think we can rest on our papers. Thank you. Mr. Harris, rebuttal? Very briefly, the fact that there was a judgment, Mr. Goldstein said there was a judgment and we paid it, the case law does not consider that compulsion to pay the judgment. So that defense is not viable here as far as the spending is concerned. As far as my invoices are concerned, yes, the bills were sent out pursuant to the agreement. There is no doubt about that because the first invoice together with the retainer agreement was sent out with a cover letter that says specifically here is the agreement and here is your first bill pursuant to the agreement and all the rest of them were pursuant to that agreement. In addition, there was back and forth with respect to the agreement with the client and the client never repudiated the agreement until the client was sued. And finally, the fact that Epstein, Becker & Green is a large firm, we have litigated that and the fact is that all the cases that enumerate the factors to be considered in coming up with a quantum merit amount say that that has nothing to do with it. The fact that the attorney with a large firm or sole practitioner is not determinative or is not even a factor to determine the quantum merit rate and the fact that Epstein, Becker has other resources, those other resources are paid separately. They're not paid by part of what the attorney's time is billed and that's also one of the factors that the courts that have dealt with this have considered. Thank you. All right, well thank you both. We will reserve decision. You're welcome to hang up.